**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Case No. 10-cv-00741-WJM-KMT

JEFFERSON COUNTY SCHOOL DISTRICT R-1,

      Plaintiff,

v.

ELIZABETH E., by and through her parents, Roxanne B. and David E.,

      Defendant.

---

### OPINION AND ORDER

---

      This matter is before the Court on Plaintiff Jefferson County School District R-1's ("District's") appeal seeking judicial review of an administrative law judge's ("ALJ's") decision under the Individuals with Disabilities Education Act ("IDEA").  The ALJ ruled that the District was required to reimburse Defendant Elizabeth E. ("Elizabeth"), by and through her parents Roxanne B. and David E., for Elizabeth's tuition and other services at a private residential treatment facility.  The matter has been fully briefed (ECF No. 19, 23, 24), and the Court has the administrative record (ECF No. 18).  After carefully analyzing the briefs and the administrative record, the Court AFFIRMS the decision of the ALJ.

### I. JURISDICTION

      The Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) because the action is brought under the IDEA.  *See also* 20 U.S.C. § 1415(i)(3)(A) (providing that U.S. district courts have jurisdiction over administrative

appeals under the IDEA).

## II.  BACKGROUND

### A.    Statutory Framework

The IDEA, 20 U.S.C. §§ 1400 *et seq.*, "imposes obligations on the states to provide certain [educational] benefits [to disabled children] in exchange for federal funds."  *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1274 (10th Cir. 2007); *see* 20 U.S.C. § 1412(a).  The main purpose of the statute is "to ensure that all children with disabilities have available to them a free appropriate public education [a "FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); *see Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1129 (10th Cir. 2008) (identifying this as the main purpose of the statute).

"The FAPE concept is the central pillar of the IDEA statutory structure."  *Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008).  A FAPE consists of both "special education" and "related services."  20 U.S.C. § 1401(9).  The statute defines "special education" as "specially designed instruction . . . to meet the unique needs of a child with a disability."  20 U.S.C. § 1401(29).  The statute defines "related services" to include "transportation, and such developmental, corrective, and other supportive services (including . . . psychological services, . . . social work services, . . . counseling services, . . . and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education . . . ."  20 U.S.C. § 1401(26)(A).  A school

2

district satisfies its obligation to provide a FAPE to a disabled child "by providing

personalized instruction with sufficient support services to permit the child to benefit

educationally from that instruction." *Bd. of Educ. of the Hendrick Hudson Cent. Sch.

Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982).  "The primary tool in

assuring that a [FAPE] is provided to all eligible children with disabilities is the

requirement that the state create an individualized education plan ("IEP") for each

disabled child."  *Miller v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1236

(10th Cir. 2009).  "The IEP is a written statement that sets forth the child's present

performance level, goals and objectives, specific services that will enable the child to

meet those goals, and evaluation criteria and procedures to determine whether the child

has met the goals." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043

(10th Cir. 1993); *see* 20 U.S.C. § 1414(d)(1)(A).

**B.    Factual Background**

The following are either findings of fact made below by Impartial Hearing Officer

Marshall A. Snider ("IHO") in his September 15, 2009 Findings of Fact and Decision

("IHO Decision"),[1] or facts evidenced by the administrative record.  They also do not

appear to be in dispute between the parties.

Elizabeth was born in 1991, and was substantially neglected by her birth parents.

(IHO Decision, at 2.)  Roxanne B. and David E. ("Parents") became her foster parents

when she was 16 months old, and they adopted her when she was three-and-a-half

---

[1] A district court evaluating the administrative record in an IDEA case "must give 'due weight' to the hearing officer's findings of fact, which are considered *prima facie* correct."  *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

years old.  (*Id.*)  In March 2000, she and her Parents moved to Colorado, and she

began attending schools within the District.  (*Id.*)  The District identified her as a student

with disabilities eligible for special education and related services under the IDEA, and

created an IEP for her.  (*Id.*)  As early as December 2000, Elizabeth was diagnosed with

Oppositional Defiant Disorder, Posttraumatic Stress Disorder, Reactive Attachment

Disorder, and Bipolar I Disorder.  (Jt. Ex. LL, at 64; *see also id.* at 28, 35, 63.)[2]

During Elizabeth's eighth grade year (the 2005-06 school year), a dispute arose

between her Parents and the District regarding whether the District was providing

Elizabeth with a FAPE.  (IHO Decision, at 2-3.)  They reached a mediated settlement

whereby the District would pay half of her tuition to attend a private school in Colorado,

Humanex Academy,[3] for the ninth grade (2006-07).  (*Id.* at 3; Jt. Ex. A at 13-17.)[4]  They

reached another such agreement for Elizabeth to attend Humanex for the tenth grade

(2007-08).  (IHO Decision, at 4; Jt. Ex. A at 7-12.)  During both of these school years at

Humanex, Elizabeth started the school years well, but by the spring she would decline

academically, have anger outbursts, go through alternative periods of reality, and have

problems staying in the classroom.  (IHO Decision, at 3-4.)  By the end of the 2007-08

school year, she had not earned enough credits to advance to the eleventh grade.  (*Id.*)

---

[2] "Jt. Ex." refers to a joint exhibit introduced by both parties at the due process hearing before the IHO.

[3] Humanex is a school for children with significant learning disabilities and emotional and behavior issues.  (*Id.*, at 3.)

[4] Her placement at Humanex was not pursuant to an IEP process, but rather pursuant to the mediated settlement.  (IHO Decision, at 3.)

On August 11, 2008, the Parents and the District entered into another settlement agreement whereby the District agreed to pay tuition at Humanex during the 2008-09 school year subject to certain conditions, including that an IEP team meeting would be convened by August 29, 2008 and the team would conduct an evaluation of Elizabeth. (*Id.* at 5-6; Jt. Ex. A, at 1-6.)  A day or two before this, the Parents had already begun looking into a potential temporary psychiatric hospitalization for Elizabeth to better evaluate and diagnose her condition.  (ECF No. 19, at 9 ¶ 32; ECF No. 23, at 8 ¶ 32; Due Process Hearing Transcript ("Transcript"), at 850:9-25, 872:10-24.)  This was prompted by Elizabeth's deteriorating behavior.  At home, she engaged in outbursts of screaming and rage, including hitting family members; stopped engaging in activities she enjoyed; and would stay in her room.  (IHO Decision, at 5-6.)  At the beginning of the new school year (which began August 12), she was absent two of the first six days, and overall was not productive.  (IHO Decision, at 4; ECF No. 19, at 9 ¶ 34; ECF No. 23, at 9 ¶ 34.)  On August 15, 2008, the Parents met with members of the District, at which time the Parents informed the District that they were considering a temporary psychiatric hospitalization of Elizabeth.  (*Id.* at 6.)  At this meeting, the Parents signed the necessary forms for the District to conduct an IEP evaluation of Elizabeth.  (*Id.* at 7.)

On August 20, 2008, the Parents placed Elizabeth at the Aspen Institute for Behavior Assessment ("Aspen") in Utah.  (*Id.*)  On August 26, 2008, the Parents first provided the District written notice of the hospitalization, informing it that

> Elizabeth was admitted last Wednesday, August 20 into Aspen Institute. This is a lock down facility that works exclusively on assessment and then where is the next best place for her to go:  home, day treatment, residential, etc.  Elizabeth will be there for about 6 to 8 weeks depending on how long it takes to figure out [this] puzzle.

(Jt. Ex. C, at 22.)

The next communication between the Parents and the District appears to have been one month later, on September 24, 2008, when the District informed the Parents that it "[is] withdrawing Elizabeth from Humanex.  [It is] not willing to incur the cost of having her enrolled even with the option of receiving a tuition refund for the months she won't attend." (*Id.* at 19.)  This e-mail mentioned the possibility of re-enrolling Elizabeth at Humanex following her hospitalization.  (*Id.*)  Two days later, the Parents' attorney (who is representing them in this action) informed the District that the Parents viewed this disenrollment as a breach of the settlement agreement.  (*Id.* at 14-15.)  On October 3, 2008, the Parents provided the District with an update on Elizabeth's progress, saying that she would be at Aspen another 2 to 4 weeks.  (*Id.* at 17-18.)

On October 7, 2008, the District responded through its counsel (who is representing it in this action), stating, "[I]t appears that at this point, the settlement agreement is moot, as parents have unilaterally placed Elizabeth at the Aspen Center in Utah.  As such, Elizabeth is not a District student, and the District has no on-going responsibility to Elizabeth under the IDEA." (*Id.* at 14.)

On November 10, 2008, the Parents' attorney notified the District that, following her placement at Aspen, the Parents would be enrolling Elizabeth at Innercept, LLC in Idaho, a residential treatment center, and that the Parents would seek reimbursement from the District for this placement.  (*Id.* at 6.)  The Parents also provided the District with Aspen's final report on Elizabeth.  (*Id.* at 5.)  On November 20, 2008, the District responded, through counsel, informing the Parents that the District would not reimburse the placement at Innercept, "but stands ready, willing, and able to provide Elizabeth with

6

a [FAPE] if she returns to the . . . District." (*Id.* at 4.)

On December 3, 2011, Elizabeth's mother e-mailed the District, stating, "[W]e think that a more productive and cost-efficient way to move forward, rather than drawing lines in the sand, is to start anew and all work together to complete Elizabeth's IEP. How would you like to proceed with this process?" (*Id.* at 3.)  The District responded on December 9, 2008, "[T]he District does not presently have an obligation to evaluate, convene IEP team meetings for, or otherwise serve Elizabeth under the IDEA. However, . . . the District stands ready, willing, and able to evaluate and provide Elizabeth with a [FAPE] upon her return to the District." (*Id.*)  After hearing back from Elizabeth's mother the same day, the District repeated its position on December 11, 2008 that it would be willing to provide an IEP and otherwise serve Elizabeth's educational needs only if she returned to the District.  (*Id.* at 1.)

## C.    Procedural Background

Elizabeth's Parents initiated the administrative process below (under 20 U.S.C. § 1415(f)), requesting a due process hearing and seeking reimbursement from the District for Elizabeth's placement at Innercept.  (IHO Decision, at 1; ECF No. 19, at 2.) The IHO conducted the due process hearing over five days in August 2009.  (*Id.*)  On September 15, 2009, the IHO issued his decision, holding that:  (1) the District did not timely make a FAPE available to Elizabeth prior to her enrollment at Innercept, (2) Innercept is an appropriate placement under the IDEA, (3) the Parents were entitled to reimbursement, and (4) reimbursement should not be reduced or denied based on (a) the Parents' alleged failure to provide notice to the District prior to placing Elizabeth at Aspen; (b) the Parents' alleged failure to make Elizabeth available to the District for an

IEP evaluation; or (c) the Parents' alleged unreasonableness.  (*See* IHO Decision.)[5]

The District appealed the IHO decision (under 20 U.S.C. § 1415(g)) to the ALJ.[6]

(*See* Decision Upon State Level Review (Corrected) ("ALJ Decision"), at 1; ECF No. 19,

at 2.)  On February 2, 2010, Administrative Law Judge Robert N. Spencer issued his

decision generally affirming the IHO decision.  (*See* ALJ Decision, at 21.)[7]

On March 31, 2010, the District filed this action (under 20 U.S.C.

§ 1415(i)(2)) appealing the ALJ decision.  (ECF No. 1.)  It filed its Opening Brief on

September 15, 2010.  (ECF No. 19.)  Elizabeth and her Parents filed their Response

Brief on October 18, 2010.  (ECF No. 23.)  The District filed its Reply Brief on November

1, 2010.  (ECF No. 24.)  The ALJ filed the administrative record with the Court on July

22, 2010.  (ECF No. 18.)

On February 9, 2011, this action was reassigned to the undersigned.  (ECF No.

27.)


## III.  STANDARD OF REVIEW AND BURDEN OF PROOF

Courts are to employ a unique standard of review in IDEA cases, one less

---

[5] The IHO also held, *inter alia*, that (4) the District must pay for Elizabeth's tuition at Innercept, as well as the costs of transportation, occupational therapy, and speech-language services; (5) the District must pay for the cost of family therapy and the Parents' travel to Innercept for that therapy; but that (6) the District is not responsible for the costs of medical services provided by a licensed physician.  (*See id.* at 31.)

[6] The ALJ was with the Colorado Office of Administrative Courts, the tribunal charged with deciding IDEA appeals in Colorado.  (ECF No. 19, at 2.)

[7] The only legal conclusion the ALJ overturned was the IHO's conclusion that the Parents were entitled to reimbursement for their travel costs to and from Innercept for family therapy.  (*Id.* at 19.)

deferential than that typically applied in review of administrative decisions.  *See*

*Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008).  In IDEA

cases, the court applies a "modified *de novo*" standard of review, *see id.*, under which it

reviews the administrative record and, "basing its decision on the preponderance of the

evidence, . . . grant[s] such relief as [it] determines is appropriate," 20 U.S.C.

§ 1415(i)(2)(C).  *See also Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 927

(10th Cir. 1995) (stating that a court must "independently review the evidence contained

in the administrative record" and "make a decision based on the preponderance of the

evidence").  In doing so, however, a court "must give 'due weight' to the hearing officer's

findings of fact, which are considered *prima facie* correct."  *L.B.*, 379 F.3d at 974.

The parties disagree as to who bears the burden of proof in this appeal.[8]  Their

briefs do not effectively distinguish between the historically separate burdens of

persuasion and production.  *See Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (discussing

burdens).  Regarding the burden of persuasion, the Court agrees with the Parents that

the District, as the plaintiff, bears the burden of persuading the Court that the

administrative decision should be reversed.[9]  *See J.W. v. Fresno Unified Sch. Dist.*, 626

F.3d 431, 438 (9th Cir. 2010) ("[T]he party seeking relief in this Court . . . bears the

burden of demonstrating that the ALJ's decision [under the IDEA] should be reversed.");

---

[8] (*See* ECF No. 19, at 22 ("[The Parents] bear the burden of proof as to each of
the elements of their reimbursement claim."); ECF No. 23, at 18 (arguing that, because
the Parents won at the administrative level, the District bears the burden of proof
because it is challenging the administrative decision).)

[9] It is unclear whether the District concedes this point in its Reply brief.  (*See* #
24, at 2 ("[I]t may be the case . . . that the [School] District has some burden to convince
the Court that the ALJ's decision should be reversed.").)

*Marshall Joint Sch. Dist. No. 2 v. C.D.*, 616 F.3d 632, 636 (7th Cir. 2010) ("Under the

[IDEA], the party challenging the outcome of the administrative hearing bears the

burden of persuasion in the district court."); *Andrew M. v. Del. Cnty. Office of Mental*

*Health & Mental Retardation*, 490 F.3d 337, 345 (3d Cir. 2007) (stating that the party

challenging an administrative decision under the IDEA bears the burden of persuasion).

*But see Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 n.4 (5th Cir.

2009) (stating that whichever party bore the burden of proof at the administrative level

also bears the burden of proof at the district court level).   While there is little authority

discussing the burden of production, the Court notes that the administrative record is

fixed and neither party has supplemented the record.   Therefore, the Court will conduct

the required "modified *de novo*" review, evaluate the record, and determine whether a

preponderance of the evidence indicates that the ALJ decision should be reversed.[10]

## IV.  ANALYSIS

20 U.S.C. § 1412(a)(10)(C) addresses the issue of reimbursement of parents

from a public school district based on the parents' enrollment of their disabled child in a

private school without the consent of the school district.   Parents are entitled to

reimbursement if (1) the school district violated the IDEA, for example, by failing to

provide a FAPE to the child, and (2) the education provided by the private school is

reasonably calculated to enable the child to receive educational benefits.   *Luke P.*, 540

---

[10] This conclusion regarding the burden of proof is not inconsistent with the ALJ's
decision regarding which party bore the burden of proof before him (*see* ALJ decision at
11), because *Schaffer v. Weast*, 546 U.S. 49 (2005), upon which the ALJ relied,
addresses the issue of which party bears the burden of proof in administrative
proceedings, and does not specifically address which party bears the burden of proof in
an appeal to U.S. District Court from an administrative proceeding.

F.3d at 1148; *see also* 20 U.S.C. § 1412(a)(10)(C)(ii).  However, even if these requirements are met, a court or hearing officer may reduce or deny such reimbursement if, *inter alia*, (1) the parents failed to give 10 days advance written notice to the school district prior to removal of the child from the public school; (2) the school district informed the parents prior to the child's removal of its intent to conduct an IEP evaluation of the child, but the parents did not make the child available for such evaluation; or (3) the parents acted unreasonably.  20 U.S.C. § 1412(a)(10)(C)(iii).

The District advances four arguments to support its claim that the ALJ decision should be reversed.  First, the District argues that Elizabeth's placement at Innercept is not a reimbursable placement under the IDEA, i.e., that it is not "reasonably calculated to enable [Elizabeth] to receive educational benefits." *Luke P.*, 540 F.3d at 1148.  (ECF No. 19, at 22-33.)  The District also argues that the Court should deny reimbursement to the Parents under 20 U.S.C. § 1412(a)(10)(C)(iii) on the following bases:  (1) the Parents failed to provide proper notice to the District that they were removing Elizabeth from school; (2) the Parents failed to make Elizabeth available for an IEP evaluation following that removal; and (3) the Parents' actions were unreasonable.  (*Id.* at 33-39.)[11]

**A.**     **Whether the Placement at Innercept is Reimbursable Under the IDEA**

---

[11] The District does not appeal other issues, such as the IHO's determination (which the ALJ affirmed) that the District would be responsible for the costs of family therapy.  Likewise, the Parents have not argued that the ALJ erred by holding that the Parents were not entitled to reimbursement for the costs of their travel to and from Innercept for family therapy.  The Court therefore declines to consider these issues.

The IHO found that "Innercept is an appropriate placement for Elizabeth and is reasonably calculated to enable her to receive educational benefits," concluding that "her mental health and behavioral issues and her academics are intertwined." (IHO Decision, at 14.)  The IHO also concluded that "Elizabeth require[s] the 24 hour a day, 7 days a week care and the structure provided by a [residential treatment center] such as Innercept in order to functional academically.  It was reasonable for the Parents to place her at Innercept . . . ." (*Id.*)  The ALJ agreed, but in so doing delved deeper into the case law discussed by the parties in this appeal.  (ALJ Decision, at 15-19.)  The ALJ identified the various tests used in different federal circuits (discussed below), and held that Innercept was an appropriate placement under any of those tests.  (*Id.* at 16-18.)

The parties spend the majority of their briefs discussing the issue of whether Innercept is a reimbursable placement under the IDEA.  (*See* ECF No. 19, at 22-33 (11 out of total of 18 pages of opening argument); ECF No. 23, at 20-39 (19 out of total of 34 pages of response argument); ECF No. 34, at 3-21 (18 out of total of 25 pages of reply argument).[12]  In discussing the various legal tests used in different federal circuits, the District argues that the Third Circuit's older, more lenient test (for parents) has been swept away by more demanding tests employed by a majority of courts, including the Fifth, Seventh, and Ninth Circuits.  (ECF No. 23-29.)  The Court now proceeds to discuss these various tests, and apply them to the facts at hand.

### 1.      Third Circuit Test:  Whether Residential Placement Is Necessary for Educational Purposes, or Instead Is a Response to Medical Problems

---

[12] The District does not present argument challenging the IHO's conclusion that the District failed to provide a FAPE to Elizabeth.  Therefore, the Court declines to address this issue.

**That Are Segregable From the Learning Process**

In *Kruelle v. New Castle County School District*, 642 F.2d 687 (3d Cir. 1981), the Third Circuit ruled that whether a public school district is required to reimburse parents for a private residential placement depends "on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are *segregable from* the learning process." *Id.* at 693 (emphasis added).  In so ruling, the court held that the parents there were entitled to reimbursement for the residential placement of their mentally retarded child with cerebral palsy who needed assistance with basic skills such as speaking, walking, dressing himself, eating unaided, and using the toilet.  *Id.* at 688-89, 693-95.  The court stated that, where a child is afflicted with such severe conditions, formal education begins with such basic life skills.  *Id.* at 693.[13]

The Fourth, Sixth, and D.C. Circuits have adopted the *Kruelle* test.  *See Burke Cnty. Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990); *Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1471 (6th Cir. 1996); *McKenzie v. Smith*, 771 F.2d 1527, 1534 (D.C. Cir. 1985).

**2.     Ninth Circuit Test:  Whether Residential Placement Is Necessary for Educational Purposes, or Instead Is a Response to Medical Problems**

---

[13] The Third Circuit had a chance to revisit this issue recently in *Mary T. v. School District of Philadelphia*, 575 F.3d 235 (3d Cir. 2009).  *Mary T.* involved the psychiatric hospitalization of a child for emergency intervention and stabilization.  *See id.* at 239, 246.  Although she received some services that had an educational benefit, the hospital did not have state educational accreditation or any on-site educators.  *Id.* at 245.  The court held that the placement was not reimbursable because the hospital's services were provided for purposes of the child's medical needs.  See id. at 244-46.  The court in *Mary T.* did not purport to change the test laid out by *Kruelle*; indeed, the court repeatedly cited and applied *Kruelle*.

**and Is Necessary Quite Apart From the Learning Process**

In *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir. 1990), the Ninth Circuit ruled that reimbursement under the IDEA for a residential placement depends on "whether [the child's] placement may be considered necessary for educational purposes or whether the placement is a response to medical, social, or emotional problems that is necessary *quite apart from* the learning process." *Id.* at 643 (emphasis added).  *Clovis* involved the placement of a child in an acute care psychiatric hospital.  *See id.* at 639.  Despite the fact that the school district sent educators to the hospital for 1-2 hours of instruction per day, the court denied reimbursement because the services provided by the hospital were medical in nature, including six hours of intensive psychotherapy per day.  *Id.* at 645-47.[14]

3.    **Seventh Circuit Test:  Whether the Services Provided Are Primarily Oriented Toward Enabling the Child to Obtain an Education, or Are Oriented More Toward Enabling the Child to Engage in Non-Educational Activities**

In *Dale M. v. Board of Education of Bradley-Bourbonnais High School District No. 307*, 237 F.3d 813 (7th Cir. 2001), the Seventh Circuit ruled that, in determining whether a residential placement is reimbursable, "[t]he essential distinction is between services *primarily oriented* toward enabling a disabled child to obtain an education and services oriented more toward enabling the child to engage in noneducational activities.  The former are 'related services' within the meaning of the statute, the latter are not."  *Id.* at

---

[14] In *Ashland School District v. Parents of Student E.H.*, 587 F.3d 1175 (9th Cir. 2009), the Ninth Circuit applied this same test in upholding a denial of reimbursement to parents who removed their child from public school for placement in an out-of-state residential treatment facility, stating that the parents placed the child in residential treatment "to treat medical, not educational, problems."  *Id.* at 1185.

817 (citing *Butler v. Evans*, 225 F.3d 887, 892-95 (7th Cir. 2000)).  The court held that

the parents there were not entitled to reimbursement for placing their child in a private

boarding school after his release from jail because the purpose of the placement was

confinement, which is not a "related service" under the IDEA.  *Id.* at 816-17.

4.      **Fifth Circuit Test:  Whether the Placement Is (a) Essential in Order for
the Child to Receive a Meaningful Educational Benefit, and (2)
Primarily Oriented Toward Enabling the Child to Obtain an Education**

The Fifth Circuit recently reviewed these various tests and came up with a test of

its own in *Richardson Independent School District v. Michael Z*, 580 F.3d 286 (5th Cir.

2009).  *Michael Z.* involved a child who was placed by his parents in a private residential

treatment center.  The court adopted the following test:  "In order for a residential

placement to be appropriate under IDEA, the placement must be 1) essential in order

for the disabled child to receive a meaningful educational benefit, and 2) primarily

oriented toward enabling the child to obtain an education."  *Id.* at 299.  Because the

district court had not issued findings of fact related to the second prong of the test, the

court remanded for the district court to consider that issue.

5.      **Application of These Tests to This Case**

The Tenth Circuit has not provided guidance as to what the relevant legal test

should be in this Circuit.  The Court declines to resolve that question here.  Instead, the

Court will apply the various tests from the other circuits, and in so doing affirms the

ALJ's conclusion that, no matter which test is employed, the Parents' placement of

Elizabeth at Innercept was an appropriate and reimbursable placement under the IDEA.

Under the Third Circuit test, the Court concludes that Elizabeth's placement at

Innercept was "necessary for educational purposes" and that her "medical, social [and]
emotional problems [were not] segregable from the learning process." *Kruelle*, 642 F.2d
at 693.  The Court also concludes that, under the Ninth Circuit test, the treatment of
Elizabeth's psychiatric condition at Innercept was not "quite apart from" her educational
needs.  *Clovis*, 903 F.2d at 643.  These conclusions are supported by several pieces of
evidence.  The first is Aspen's final report on Elizabeth, which recommended her
placement in a residential treatment center.  (*See* Jt. Ex. S.)  The final report not only
concluded that placement in a residential treatment facility was necessary so that
Elizabeth can be "in a structured program under clinical and psychiatric care," but also
concluded that "[t]his structured environment will ensure that she remains on a clear
and successful academic path." (*Id.* at 48.)  The report further concluded that Elizabeth
"is likely to show improvements in her school performance and behavior at a [residential
treatment center] because of the clinical milieu that pervades the academic
environment." (*Id.* at 50.)

The testimony of several individuals at the due process hearing before the IHO
also supports the conclusion that the Third and Ninth Circuit tests are met here.  The
medical director and attending psychiatrist at Innercept, Dr. George Ullrich, an expert in
child and adolescent psychiatry (Transcript, at 408:20 - 409:2), testified that her mental
health is intertwined with her educational success, and that

> when she is doing better with her mental health, she starts to function
> better in the classroom, she starts to have improved self-esteem because
> she's having some success, then she starts to consider the possibilities for
> her life that she doesn't consider when she's having no success in the
> classroom.

*Id.* at 519:8-19; *see also id.* at 464:13 - 467:7; 473:7-21; 479:1-12; 480:16 - 481:16.)  Dr.

16

Partha Gandhi, the director of psychology at Aspen (*see id.* at 119:6-11), testified that Elizabeth's emotional stability and behavior impact her ability to learn in the classroom, and that it is impossible to address her educational needs without addressing her mental health needs. (*See id.* at 184:1-11; *see also id.* at 138:7 - 139:5, 143:10 - 144:9; 169:24 - 170:14; 177:16-23. *But see id.* at 141:14-17 (stating that Elizabeth could receive some educational benefit without placement in a residential treatment program).) Even the testimony of David Miller, an assistant principal and counselor at Humanex (*see id.* at 190:6-18), provides more support than not for the proposition that Humanex was not an appropriate placement for Elizabeth and that a 24-hour-per-day placement would be more appropriate. (*See id.* at 195:4-11 (testifying that Elizabeth was "probably in the 2 percent of the population that really had a hard time making it at Humanex; and, again, it's mainly because we couldn't figure out what the heck was wrong with her"); *see also id.* at 203:18-20, 213:9 - 214:10; 220:7-21; 223:7 - 225:23. *But see id.* at 218:24 - 219:15 (testifying that, as of June 2008, it was his opinion that Humanex could still work for Elizabeth and that, as of August 2008, she could have made it longer at Humanex), 247:20 - 248:9.)

These pieces of evidence, considered together, show by a preponderance of the evidence that Elizabeth's placement at Innercept was "necessary for educational purposes," that her "medical, social [and] emotional problems [were not] segregable from the learning process," and that the treatment of her psychiatric condition at Innercept was not "quite apart from" her educational needs. *Kruelle*, 642 F.2d at 693; *Clovis*, 903 F.2d at 643.

Under the Fifth and Seventh Circuit tests, the primary issue is whether the

services provided by Innercept to Elizabeth were "primarily oriented" toward enabling Elizabeth to obtain an education.  *See Dale M.*, 237 F.3d at 817; *Michael Z*, 580 F.3d at 299.  Although this is a closer question, the Court holds that a preponderance of the evidence shows that the services Innercept provided to Elizabeth were "primarily oriented" toward providing Elizabeth an education.[15]

In addition to all the due process hearing testimony described above, crucial to this determination is the fact that Innercept is an educational institution accredited by the State of Idaho, staffed by state-accredited teachers, in which Elizabeth is working towards her high school diploma.  (Jt. Ex. AA, KK.)  Julie Green, the principal and director of education at Innercept, testified that Elizabeth told Ms. Green how important it was to her to graduate from high school.  (Transcript, at 654:8 - 655:16.)  Ms. Green also testified that Elizabeth's schedule includes three hours in the morning in the classroom, and one to one-and-a-half hours of homework during the evening.  (Transcript, at 652:8-25.)  When Elizabeth is not able to participate in the classroom, she instead receives one-on-one instruction outside of the classroom.  (*See id.* at 696:20 - 697:9.)[16]

---

[15] The Court also holds that the Fifth Circuit's additional requirement that the placement be "essential in order for the disabled child to receive a meaningful educational benefit," *Michael Z*, 580 F.3d at 299, is met here because of the aforementioned evidence of Aspen's final report and the due process hearing testimony of witnesses Ullrich, Gandhi, and Miller.

[16] These factors -- that Innercept is an accredited educational institution staffed by accredited teachers, that Elizabeth can work towards high school graduation at Innercept, and that Elizabeth regularly spends between four and four-and-a-half hours per day on educational work -- make this case distinguishable from *Mary T*. and *Clovis*, which involved the placement of the children at psychiatric hospitals with little educational instruction.

The District focuses on the fact that the due process hearing testimony of Doctors Gandhi, Ullrich, and Davidson (Elizabeth's psychiatrist at Aspen) emphasized that a residential treatment program was necessary because of Elizabeth's psychiatric needs, not her educational needs.  (*See* ECF No. 19, at 31-32.)  As an initial matter, the Court is not surprised that the testimony of two psychiatrists and a psychologist would be more focused on Elizabeth's psychiatric/psychological needs rather than her educational needs.  But more importantly, the fact that Elizabeth's psychiatric conditions played a prominent role in her initial placement at Innercept does not foreclose the possibility that Elizabeth's tuition and related services at Innercept are reimbursable under the IDEA.  The crucial issue is not the initial motivation behind the placement, but instead "whether the education provided by the private school is reasonably calculated to enable the child to receive educational benefits."  *Luke P.*, 540 F.3d at 1148.[17]  Thus, a court should instead be focused on the actual services provided by the residential treatment facility to the child throughout the child's stay at the facility.  This will enable the court to determine whether the placement provided sufficient "specially designed instruction . . . to meet the unique needs of [the disabled] a child," 20 U.S.C. § 1401(29), and whether the "related services" being provided were "required to assist [the disabled] child . . . to benefit from special education," 20 U.S.C. § 1401(26)(A).

---

Also, *Dale M.* is distinguishable because, while "confinement" is not a "related service" under the IDEA (the basis for the court's decision in *Dale M.*), here the related services include psychological services, counseling services, and counseling services, all of which are expressly covered under 20 U.S.C. § 1401(26)(A).

[17] To the extent that case law has emphasized the importance of the purpose of the *initial* placement, *see, e.g.*, *Ashland*, 587 F.3d at 1185, the Court disagrees with that emphasis.

The Court holds that a preponderance of the evidence in the administrative record establishes that Elizabeth's placement at Innercept was a reimbursable placement under the IDEA.

**B.    Whether the Parents Failed to Provide the District Proper Notice of Elizabeth's Removal**

The IHO held that the Parents had no duty to provide written notice to the District prior to Elizabeth's removal from Humanex and hospitalization at Aspen on August 20, 2008, because 15 U.S.C. § 1412(a)(10)(C)(iii)(I) applies to the placement of a child in a private school, not the temporary hospitalization of a child.  (IHO Decision, at 23-25.) The IHO found that the Parents were only required to provide such notice prior to Elizabeth's placement at Innercept, and the Parents provided that notice on November 10, 2008.  (*Id.*)  The ALJ affirmed this decision in all respects.  (ALJ Decision, at 12-13.)

The District argues that the IHO and ALJ re-wrote the governing statute, which states that such written notice must be given prior to the *removal* of the child from the public school, and Elizabeth was clearly "removed" from Humanex in August 2008 prior to her placement at Aspen.  (ECF No. 19, at 33-35.)

The Court agrees with the IHO and ALJ.  20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) states that, "10 business days . . . prior to the removal of the child from the public school, the parents [must] give written notice to the [school district] *of the information described in [section] (aa)*" (emphasis added).  Section 1412(a)(1)(C)(iii)(I)(aa) provides that the parents must inform the school district of the following information:  (1) that the parents are rejecting a placement proposed by the school district; and (2) that the parents *intend to enroll their child in a private school* at public expense.  The fact that

20

these provisions relate to the parents' removal of a child from a public school *with the intent to enroll the child at a private school* is reinforced by the fact that 20 U.S.C. § 1412(a)(10)(C)(iii) exists as a limitation on section 1412(a)(10)(C)(ii), which deals with reimbursement to parents for their *enrollment* of a disabled child in a private school. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) (dealing with reimbursement for the "*enroll*[*ment*]" of a child at a private school) (emphasis added); *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2496 (2009) (stating that section 1412(a)(10)(C)(iii) gives a court discretion to reduce or deny reimbursement where "the parents failed to give the school district adequate notice of *their intent to enroll* the child in private school") (emphasis added).

The record indicates that, as of August 20, 2008 when the Parents placed Elizabeth at Aspen, they were not rejecting any placement proposed by the District. There is also no indication in the record that, as of August 20, 2008, the Parents already had an intent to enroll Elizabeth at a different school other than Humanex.  Elizabeth was temporarily hospitalized at Aspen for purposes of assessment and diagnosis of her psychiatric conditions, and the Parents are not seeking reimbursement for that hospitalization.  Thus, the Parents did not have an obligation prior to August 20, 2008 to provide the written notice described in 20 U.S.C. § 1412(a)(10)(C)(iii)(I).

The District contends that the purpose of the advance notice requirement is to give the school district "an opportunity to correct any alleged concerns before the student leaves the district."  (ECF No. 19, at 34.)[18]  As discussed above, the notice requirement is only triggered when the parents remove a child from the school district

---

[18] (*See also* ECF No. 24, at 25 (stating that the purpose of the statute is "so that a remedy can be identified and implemented in an effort to avoid the removal.").)

*with the intent of enrolling the child at a private school.*  On November 10, 2008, the

Parents *did* provide the District with sufficient written notice of their intent to enroll

Elizabeth at Innercept.  After receiving that notice, the District had an opportunity "to

correct any alleged concerns" of the Parents.  Instead of doing so, the District continued

to maintain its (incorrect) position that it had no obligation to Elizabeth as long as she

was not physically present in Colorado.  *See Catlin v. Sobol,* 93 F.3d 1112, 1123 (2d

Cir. 1996) (ruling that the IDEA "presume[s] that the child's residence is that of his

parents . . . and it is that home district which is required to provide the child with a

FAPE"); *Wise v. Ohio Dept. of Educ.*, 80 F.3d 177, 182 (6th Cir. 1996) ("[S]tates'

obligation under IDEA to provide a [FAPE] to all children with disabilities . . . includes

those children who are receiving services in another state but whose parents reside in

the state.").

Further, even if it were a closer question as to whether the Parents' placement of

Elizabeth at Aspen without prior written notice violated 20 U.S.C. § 1412(a)(10)(C)(iii)(I),

under the circumstances of this case[19] the Court would not exercise its discretion to

reduce or deny reimbursement on this basis.  *See* 20 U.S.C. § 1412(a)(10)(C)(iii) (listing

the circumstances under which a court *may* reduce or deny reimbursement); *T.A.*, 129

S. Ct. at 2496 ("courts retain discretion to reduce the amount of a reimbursement award

if the equities so warrant"); *Michael Z*, 580 F.3d at 301 (stating that section

---

[19] Namely, (1) Elizabeth's deteriorating condition at the time of her hospitalization, (2) the Parents' right to hospitalize their daughter for a temporary period for evaluation and diagnosis, and (3) their right to do so at their own expense without informing the District in advance, given that there is no evidence that they intended to disenroll Elizabeth from Humanex at that time.

1412(a)(10)(C)(iii) gives "the district court broad discretion to determine reimbursement. Accordingly, the district court did not abuse its discretion by awarding reimbursement despite the lack of notice.").

**C.    Whether the Parents Failed to Make Elizabeth Available for an Evaluation**

The IHO held that the Parents did not fail to make Elizabeth available for an evaluation under 20 U.S.C. § 1412(a)(10)(C)(iii)(II) because, although the placement of Elizabeth at Aspen prevented the District for conducting its evaluation in late August 2008, the District subsequently disavowed any obligation to Elizabeth in early October 2008 and never again requested to evaluate Elizabeth. (IHO Decision, at 25.) The IHO emphasized that the District continued to maintain this position even after Elizabeth's mother requested an IEP meeting in early December 2008. (*Id.*) The IHO also stated that, even if the Parents had violated section 1412(a)(10)(C)(iii)(II), the facts of the case would not warrant exercising the IHO's discretion to reduce or deny reimbursement on that basis. (*Id.* at 26.) The ALJ affirmed, holding that it was not the Parents' placement of Elizabeth at Aspen that prevented the District from conducting its evaluation, but instead the District's own subsequent failure to pursue an evaluation and refusal to convene an IEP meeting. (ALJ Decision, at 14.)

The District contends that the Parents prevented the District from evaluating Elizabeth, arguing that it was not obligated to demand an evaluation where the Parents had removed Elizabeth from Colorado with no intention of returning her to Colorado, and where the District had repeatedly informed the Parents that it stood ready, willing, and able to serve Elizabeth upon her return to Colorado. (ECF No. 19, at 35-38.)

20 U.S.C. § 1412(a)(10)(C)(iii)(II) provides that a court may reduce or deny

reimbursement "if, prior to the parents' removal of the child from the public school, the public agency informed the parents . . . of its intent to evaluate the child . . ., but the parents did not make the child available for such evaluation."  By early August 2008, the District had clearly requested to evaluate Elizabeth.  Thus, the Parents initially had a duty to make Elizabeth available for the evaluation requested.  However, the Court concludes, as did the IHO and ALJ, that the Parents' duty to make Elizabeth available for an evaluation was extinguished when the District disavowed any responsibility to Elizabeth on October 7, 2008.  The District could have revived the Parents' duty by changing its position and again requesting an IEP evaluation.  However, the District never did so, maintaining its incorrect position that it only had a duty to serve Elizabeth if she physically returned to Colorado.  *See Catlin,* 93 F.3d at 1123; *Wise*, 80 F.3d at 182.  Thus, at no point did the District revive the Parents' original obligation to make Elizabeth available for an IEP evaluation.

Even if it were appropriate to view the District's position with more sympathy, both sides would share the blame for not convening an IEP meeting to evaluate Elizabeth.  The Parents could be viewed as sharing in the blame because they never brought Elizabeth back to Colorado.  However, the District would continue to shoulder most of the blame because of its incorrect position that it had no obligation to Elizabeth as long as she remained outside of Colorado.  Even when viewing the dispute in this light more favorable to the District, under the circumstances[20] the Court would not in any

---

[20] In addition to the circumstances listed in footnote 19, *supra*, the Court also considers here the fact that (4) the District disenrolled Elizabeth from Humanex without advance notice to her Parents, (5) the District disavowed any responsibility for Elizabeth's education prior to the date on which it had notice of the Parents' decision to

event exercise its discretion to reduce or deny reimbursement based on the Parents' alleged failure to make Elizabeth available for an IEP evaluation.  *See* 20 U.S.C. § 1412(a)(10)(C)(iii); *T.A.*, 129 S. Ct. at 2496; *Michael Z*, 580 F.3d at 301.

## D.    Whether the Parents Acted Unreasonably

The IHO held that reimbursement should not be reduced or denied based on the Parent's alleged unreasonableness (IHO Decision, at 27-29), finding that the Parents "acted reasonably in all their actions."  (*Id.* at 28.)  The ALJ disagreed to some extent, faulting the Parents for failing to provide the District with notice prior to Elizabeth's non-emergent hospitalization at Aspen.  (ALJ Decision, at 19-20.)  However, the ALJ held that the "Parents' action . . . was overcome by the District's total refusal to work with the Parents after it learned Elizabeth was hospitalized [at Aspen]."  (*Id.* at 20.)[21]

The District accuses the Parents of bad faith, blaming them for not returning Elizabeth to Colorado and not availing themselves of the services available in Colorado.  (ECF No. 38-39.)  "[T]he parents were playing a game with the . . . District – manipulating the system so that Elizabeth's placement would be determined based solely on the decision of privately-retained mental health professionals outside the IDEA-approved process."  (*Id.* at 39.)

The Court does not know whether the Parents intended all along to get Elizabeth

---

enroll Elizabeth at Innercept; and (6) the District maintained that position (as long as Elizabeth was not located in Colorado) even after Elizabeth's mother affirmatively sought out an IEP meeting with the District.

[21] While the Court does not fully agree with every statement made in the IHO Decision and ALJ Decision, the Court applauds IHO Snider and ALJ Spencer for their careful examination of the record and thorough analysis in this case.

out of the District and into a different private school, while forcing the District to reimburse them for that placement.  However, the administrative record does not sufficiently support that conclusion (in fact, it comes nowhere close).  If the District had contacted the Parents while Elizabeth was at Aspen, continuing to reiterate its position that it would like to serve Elizabeth's educational needs and conduct the IEP necessary to do so, this case may well have turned out quite differently (as the IHO and ALJ discuss).   This approach would have forced the Parents to work with the District following Elizabeth's hospitalization, or seriously risk having to fund her subsequent out-of-state residential placement themselves.

Instead, the District took a nearly polar opposite course of action.  One of the first communications the Parents received from the District following Elizabeth's placement at Aspen informed them that the District had *already* disenrolled Elizabeth from Humanex.  One of the next communications from the District informed the Parents that the District believed it had no further obligations towards Elizabeth.  And the District never changed its incorrect position that it had no obligation to Elizabeth as long as she was not physically present in Colorado.  Under these circumstances,[22] the Court declines to exercise its discretion to reduce or deny reimbursement based on the Parents' alleged unreasonableness.  *See* 20 U.S.C. § 1412(a)(10)(C)(iii); *T.A.*, 129 S. Ct. at 2496; *Michael Z*, 580 F.3d at 301.

E.    **Amount of Reimbursement**

The District's Opening Brief only addresses the *amount* of reimbursement in its

---

[22] *See also* footnote 19, *supra*.

statement of facts section, where, without providing any argument, it states that "[t]he cost of Elizabeth's program at Innercept is $9,800.00 per month, the medical component of which is $7,350.00 per month." (ECF No. 19, at 21.)  In Response, the Parents argue that the only services provided to Elizabeth by a licensed physician, which are the only services for which the ALJ declined reimbursement, are the small component of "medical management" on the Innercept invoices.  (ECF No. 23, at 38-39. *See also* Jt. Ex. EE.)  The Parents point out that their due process complaint pled that these services only amount to four percent of the total monthly cost of Innercept.  (ECF No. 23, at 29.)  The District does not respond to this issue in its Reply Brief.

The Court agrees with the IHO and ALJ that services provided by a licensed physician at Innercept are not reimbursable under the IDEA.  *See* 20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34(c)(5).  The Court has not located sufficient evidence in the record to assist it in determining precisely what amount the District should reimburse the Parents for "special education" and covered "related services," and what precise amount should be excluded based on services provided by a licensed physician. The Court does note, however, that it appears that the only licensed physician employed by Innercept was the medical director, Dr. Ullrich.  (*See* IHO Decision, at 12; Transcript, at 412:23 - 414:6.)

The Court directs the Parents to request of Innercept a more detailed invoice covering the time period Elizabeth has been at Innercept, which distinguishes between services provided by a physician and those provided by non-physicians.  The Court also directs the Parents to request that Innercept continue to provide such detailed invoices in the future.  Upon receiving the more-detailed invoices, the Parents will provide them

27

to the District for purposes of reimbursement, and the District will reimburse the Parents for any services provided at Innercept that were not provided by a licensed physician.

## V.  CONCLUSION

In accordance with the foregoing, it is therefore ORDERED that the February 2, 2010 decision of the ALJ in this matter is hereby AFFIRMED.  The Clerk shall enter Final Judgment in conformity with this Opinion and Order.

Dated this 29th day of June, 2011.

BY THE COURT:

William J. Martínez
United States District Judge